[Cite as *State v. Johnson*, 2023-Ohio-445.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Plaintiff-Appellee, | : | No. 110942 |
| v. | : | |
| WILLIAM JOHNSON, | : | |
| Defendant-Appellant. | : | |

### JOURNAL ENTRY AND OPINION

**JUDGMENT:** REVERSED, VACATED, AND REMANDED
**RELEASED AND JOURNALIZED:** February 16, 2023

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-20-652314-A

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Brandon A. Piteo and Mallory Buelow, Assistant Prosecuting Attorneys, *for appellee.*

Myron P. Watson, *for appellant.*

EILEEN A. GALLAGHER, J.:

{¶ 1} Defendant-appellant William Johnson appeals his convictions for domestic violence and child endangering following a bench trial. He contends that (1) the trial court erred by admitting statements made by the alleged victim during a 911 call in violation of his rights under the Sixth Amendment's Confrontation

Clause and the rules of evidence and (2) his guilty verdicts are against the manifest weight of the evidence.  For the reasons that follow, we reverse the trial court, vacate Johnson's convictions and remand for further proceedings.

**Factual Background and Procedural History**

{¶ 2} On October 26, 2020, a Cuyahoga County Grand Jury indicted Johnson on one count on domestic violence in violation of R.C. 2919.25(A), a fourth-degree felony, and one count of child endangering in violation of R.C. 2919.22(A), a first-degree misdemeanor.  The charges related to Johnson's alleged assault of his child's mother, Tierra Rogers, on March 27, 2020, at their apartment in Parma, Ohio.  Johnson pled not guilty to both charges.

{¶ 3} Johnson waived his right to a jury trial.  A bench trial was scheduled for April 19, 2021.  On the morning of trial, Johnson made an oral motion to preclude the state from offering testimony from Rogers' mother during the trial.  Johnson indicated that he had just learned that Rogers was "not present pursuant to a subpoena" and that the state was, instead, intending to call Rogers' mother to testify.[1]  Johnson claimed that the state had not properly disclosed information relating to Rogers' mother's anticipated testimony during discovery and that Johnson would be prejudiced if the state were permitted to offer this "surprise" testimony at trial.  The state disputed Johnson's claims, asserting that Rogers' mother had been listed on the state's witness list, that the state would be "simply

---

[1] Rogers' mother never testified.

using" Rogers' mother to identify Johnson in court and that "any information that she may provide to the [c]ourt was exchanged in discovery through the 911 call." Over the state's objection, the trial court continued the trial until June 9, 2021. On June 9, 2021, at the state's request (after the state disclosed that it had "inadvertently overlooked this trial" and was not prepared to try the case that day) and, over Johnson's objection, the trial court granted a second continuance.

{¶ 4} On June 30, 2021, the case proceeded to a bench trial. On the morning of trial, Johnson made an oral motion in limine[2] to exclude the audio recording of the 911 call Rogers had made following the alleged assault, arguing that under *Davis v. Washington*, 547 U.S. 813, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006), and *Hammon v. Indiana*, 547 U.S. 813, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006), Rogers' statements on the 911 call were testimonial and violated Johnson's right to confront the witness against him. Johnson argued that "[t]he state has to establish that there's an ongoing emergency" for Rogers' statements on the 911 call to be admissible and that there was no ongoing emergency at the time Rogers made the 911 call because (1) Rogers, at that time, had left the residence where the alleged domestic violence occurred and was "in the safe custody [of] her parents' home and away from the alleged offender who abused her" and (2) Rogers was describing events to the 911 dispatcher that had occurred in the past. Johnson also argued that, under these circumstances, Rogers' out-of-court statements did not constitute

---

[2] Defense counsel stated that he did not submit the motion in limine in writing prior to trial because he did not know Rogers "was not going to show up" to testify at trial.

"excited utterances" and were inadmissible under the rules of evidence. Johnson asserted that the questions posed by the 911 dispatcher, to which Rogers responded, were not necessary to resolve an ongoing emergency but were "just additional questions to identify the suspect and to get further information for prosecution of this case."

{¶ 5} In response, the state argued that testimony from the 911 dispatcher would be used to authenticate the recording of the 911 call and that Rogers' statements on the 911 call were admissible because they were "excited utterances" (and, therefore, admissible under the rules of evidence) and were "made for the primary purpose of meeting an ongoing emergency" (and were, therefore, non-testimonial and did not violate the Confrontation Clause). The state asserted that Rogers' statements on the 911 call qualified as excited utterances and were non-testimonial under the ongoing emergency exception because (1) the 911 call was made approximately 15 minutes after the incident while the event was "still fresh" in Rogers' mind[3] and (2) Rogers did not know whether Johnson was still in the residence, there was a firearm in the residence and Rogers, therefore, needed police assistance "to address that ongoing emergency."

{¶ 6} After reviewing *Davis*, the trial court denied Johnson's motion in limine "for the reasons set forth by the state." The trial court failed to listen to the recording of the 911 call before ruling on Johnson's motion in limine.

---

[3] The fact that an event is "still fresh" in a declarant's mind does not qualify a statement as an excited utterance.

{¶ 7} Allyson Walentik, the 911 dispatcher who received Rogers' 911 call, and three Parma police officers testified at the trial. The parties stipulated that Johnson had committed a prior domestic violence offense and that Johnson was the father of R.J., the victim identified in the child endangering count.

{¶ 8} Over Johnson's objection, Walentik testified via Zoom. She stated that she received a 911 call from Rogers "on the evening of March 27, 2020." There was no evidence presented as to the specific time the 911 call was received. The state played a recording of the 911 call, and Walentik confirmed that the recording was a fair and accurate representation of the call she received from Rogers.

{¶ 9} The 911 call begins with Walentik inquiring, "Where is your emergency?"[4] Rogers responded, "in Parma." Rogers stated that she had "just left," that she did not have her phone and that she wanted to "report an assault" at her home in Parma, providing the address of her Parma apartment. Walentik asked Rogers, "What's going on there?" Rogers responded that she had been sleeping when her child's father (later identified, in response to Walentik's questions, as Johnson) entered the house and started hitting her, trying to wake her up, saying that she owed him some money. Rogers indicated that she told Johnson to be quiet, that the baby was sleeping and that Johnson was going to wake him, but that Johnson responded, he "didn't care." She stated that Johnson turned the lights on, started chasing her around and "started drawing up at me." She stated that she

---

[4] The fact that the recording of the 911 call was "not officially transcribed by the court reporter at trial," *see* Dissent at fn. 29, is of no effect. The recording is part of the record and it is, therefore, appropriate to quote it here.

"never hit him," that she "never did nothing to him" and that she was just running away, but that Johnson took her phone and threw it and said if she did not give him the money, he would kill her. Rogers said that Johnson told her "all this stuff" and that "I kinda blacked out with the baby in my arms." She stated that she fell down the steps as she tried to run out of the apartment, but that Johnson would not let her go. She indicated that she was screaming and opened the shades and that Johnson then tried to close the shades "so that people wouldn't hear."

{¶ 10} Walentik asked Rogers, "Where is he right now?" and "Are the children with you or with him?" Rogers told Walentik that, to her knowledge, Johnson was "still there" but that she had left the apartment with her son and drove to her parents' home in Maple Heights.

{¶ 11} Rogers told Walentik that she had a gun in the apartment and that it was registered in her name. Rogers indicated that she "did not pull it on him or anything" and that it was "put up in the house" and she "couldn't get to it" but that she wanted Walentik to know it was there. Walentik asked the location of the gun and whether there were any other weapons in the apartment. Rogers responded that the gun was in the closet of the upstairs bathroom and that she was not aware of any other weapons in the apartment.

{¶ 12} In response to further questioning by Walentik, Rogers provided Johnson's name and date of birth and her name and phone number. Walentik asked Rogers when she had left the apartment and Rogers responded that she had left "like 10 minutes ago." Rogers explained that it takes 10 minutes to get to her parents'

house in Maple Heights from her apartment in Parma and that she was calling from her mother's phone because Johnson had taken her phone and thrown it somewhere in the apartment. Rogers stated that, instead of trying to find her phone, she left without it because she "just had to get out of there."

{¶ 13} Walentik asked Rogers whether Johnson was "intoxicated or anything" and Rogers responded that she believed he was. Walentik asked Rogers whether Johnson had "hit her at all" and Rogers responded that Johnson had been "choking" her and that he had also used his knee to "bash [her] head into the wall" when Rogers resisted Johnson's attempts to "drag [her] up the steps." Rogers stated that her father had told her Johnson's nail marks were around her neck. When asked whether she "need[ed] an ambulance," Rogers responded that she did not.

{¶ 14} Walentik asked Rogers whether she "wanted charges on him for doing this." Rogers replied, "I don't know," but stated that her father wanted her to press charges against Johnson.

{¶ 15} Walentik asked Rogers what type of car Johnson drove. Rogers stated that she had the only car and had used it to drive to her parents' house. Walentik asked Rogers whether Johnson lived with her. Rogers stated that Johnson was currently living with her at her apartment but that he was not on the lease. The recording of the 911 call ends abruptly with Walentik stating, "Hold on for just a second." Accordingly, it is unknown whether the complete 911 call was introduced

at trial.  The recording of the 911 call introduced at trial lasted approximately 4 minutes and forty-five seconds.[5]

{¶ 16} Walentik testified that, as a 911 dispatcher, she answers emergency and nonemergency phone calls and dispatches police officers and the fire department, as appropriate, to respond to those calls.  She stated that she receives calls in "[a]ll kind of circumstances; emergencies, nonemergencies, accidents, crimes in process or crimes after the fact."

---

[5] It is not entirely clear from the record whether the trial judge heard everything Rogers said during the 911 call.  At the conclusion of the state's direct examination of Walentik, the following exchange occurred:

THE COURT: * * * Ms. Walentik, as I said just a short moment ago, off the record, I found it difficult to understand her, particularly early on in the course of her call.  Did you have difficulty understanding her yourself at the time?

THE WITNESS: At the time I don't recall. I would listen to the recording on the initial court date when we appeared down there and it was continued.  I don't recall — I don't recall not understanding it, but I'm not sure.

THE COURT: In a nutshell, if what I believe I did hear, was her saying, that in her opinion Mr. Johnson, the defendant, was intoxicated, that he choked her, left nail marks around her neck, banged her head against the wall.  It sounded like she was injured, but did not require an ambulance.  Would that be a fair summary of her statement to you?

THE WITNESS:  Yes.

THE COURT:  Is there anything in particular about her statement to you that you think the court ought to be paying particular attention to?

THE WITNESS:  I remember her saying that there was a weapon in the apartment in the upstairs bathroom, I believe it was.  Other than that, no.

{¶ 17} Walentik testified that it is her job "[t]o relay information to the officers for the public safety and for their safety and to make sure they have all available information." She stated that when she receives information from a 911 caller, she types it into the computer, and "the dispatcher then reads that [information] and relays it to the [police] officers on the radio."[6] Walentik indicated that she would characterize Rogers' 911 call as involving an "emergency" because Rogers "was assaulted," she "immediately called, sounded like when she got to her parents' house" and "she sounded afraid." However, Walentik stated that, in her view, Rogers was not "still in danger" and that "there was no immediate danger" at the time Rogers made the 911 call "[b]ecause she was not with [Johnson]" and "he * * * didn't have the means to get to her parents' house right away." Walentik acknowledged that once she realized Rogers was not in immediate danger, she transitioned her questioning toward obtaining identifying information about Rogers' assailant.

{¶ 18} Walentik testified that the questions she asked of Rogers during the call, including the location where the incident occurred and the name and date of birth of her assailant, were designed to obtain information the police could use "to follow up regarding that information." She further acknowledged that "for police to

---

[6] It was unclear from Walentik's testimony whether she relayed the information she received from Rogers directly to police officers over the radio or whether that was the function of another police dispatcher.

follow up," the information she obtains "has to be given to the prosecutor for further prosecution."

{¶ 19} Parma patrol officer Zachary Stoyka was one of the responding officers at the scene of the alleged March 27, 2020 incident. He testified that, at approximately 4:19 a.m., he arrived at an apartment on O'Malley Drive,[7] responding to a call in which a female reported that her boyfriend/child's father had "beat her up." Stoyka stated that he received this information from the Parma dispatcher regional center via radio. He testified that "[a]fter gathering some further information from [Rogers]," i.e., that Johnson "could possibly" be in the apartment and that there was a weapon in the apartment, he waited for some other officers to arrive on scene.

{¶ 20} Stoyka testified that when he spoke with Rogers, she "seemed a little flustered," "was angry," "[s]he didn't appear to be normal, as you would say[,] she was emotional" and "she seemed to be a little bit off." With respect to whether Rogers had any visible injuries, Stoyka stated that "[i]t appeared there was some red marks around her neck."

{¶ 21} After additional officers arrived on scene at Rogers' home, the officers entered the apartment at the main entrance on the first floor. Stoyka testified that as he entered the apartment, he saw "some sort of vomit on the ground." The officers then proceeded to do a "security sweep" of the residence "room by room" to make

---

[7] No evidence was presented as to how long after the 911 call police arrived at the apartment. There was no evidence as to what time the 911 call was made other than it was during "the evening" of March 27, 2020.

sure no one was in the apartment. He stated that the officers did not find anyone in the apartment.

{¶ 22} Parma police officer Paul Martin testified that on March 27, 2020, he responded to a call on O'Malley Drive regarding "a disturbance of some nature called in by a female." He stated that Rogers was not at the scene when he arrived. He indicated that the officers spoke with Rogers first on the phone and then, again, on scene, after she arrived. He stated that the officers "advis[ed] [Rogers] of her options" and "gather[ed] some information" from her. After it was decided that officers should "go in and check" the apartment, he and other officers entered the apartment, and he took photographs of the interior of the apartment. Martin stated that he recalled Rogers telling the officers that she had vomited inside the apartment and he identified copies of photographs he took at the scene that showed vomit on the hardwood floor.[8] He also identified copies of photographs he took of Rogers' injuries and explained that he had observed "[r]edness to the front of [Rogers'] neck."[9] Martin could not recall what Rogers said about the incident or whether she filled out a victim statement and could not recall Rogers' demeanor at the scene. He

---

[8] In its appellate brief, the state asserts, citing the testimony of Martin, that the vomit observed on the floor of Rogers' apartment was "consistent with statements made by Rogers that she vomited *as a result of being choked by Defendant-Appellant*." (Emphasis added.) No such evidence was presented at trial. Martin testified only that Rogers had told officers she had vomited, not that she had vomited as a result of being choked by Johnson. Likewise, despite the state's assertions to the contrary, Rogers did not state, on the 911 call, that Johnson had "choked her until she vomited."

[9] The color copies of the photographs that were admitted into evidence are not very clear. They do show an area of redness in the middle of the front of Rogers' neck.

did not recall whether the dispatcher or one of the other officers had advised him that there might be a firearm on the premises. Martin stated that he did not witness the incident and that the accused was not at the scene during the time he was there.

{¶ 23} Parma police detective Thomas Connor was assigned to investigate the alleged March 27, 2020 incident. He testified that, when investigating the incident, he reviewed the patrol officers' reports, including the victim witness statement, made a telephone call to the alleged victim and reached out to the Lyndhurst Municipal Court. Johnson stated that he then spoke with the assistant city prosecutor, presented him with the facts of the case as he understood them and that a warrant was obtained for Johnson's arrest.

{¶ 24} Connor identified Johnson in court as the alleged suspect in the alleged March 27, 2020 incident. Connor testified that Johnson was arrested on August 10, 2020 after Johnson called police and reported that "his girlfriend was holding a knife or had a knife, something to that degree." He stated that, in response to Johnson's call, police responded to "the same location" as the March 27, 2020 alleged incident, i.e., Rogers' apartment, and that when they "ran" Johnson's information, the arrest warrant "came up," so officers arrested Johnson. Connor testified that after he learned Johnson had been arrested, he "went down to process [Johnson] in the jail," i.e., taking booking photographs, obtaining basic information and attempting to talk to Johnson. Connor stated that Johnson declined to give a statement at that time "until an attorney was present." Connor indicated that he did not make a further attempt to interview Johnson after Johnson obtained counsel.

Connor stated that he was not involved when officers arrested Johnson and did not know whether Johnson made any statements to the arresting officers.

{¶ 25} At the conclusion of the witness testimony, the state requested that its exhibits — a journal entry reflecting a domestic violence conviction for Johnson on April 28, 2015 in Lyndhurst M.C. No. 12CRB00803, the recording of the 911 call and copies of photographs of Rogers' neck and the vomit at Rogers' apartment — be admitted into evidence. Johnson, once again, objected to the admission of the 911 call. Over Johnson's objection, the trial court admitted all the state's proffered exhibits into evidence. With respect to its admission of the 911 call, the trial court stated:

> It does appear to the court that the victim, [Rogers], is making that call, was upset, clearly agitated as indicated by her, as only 10 minutes since she found herself in an extremely disturbing situation and believed that she had been attacked by the defendant.
>
> Accordingly, I believe it does count and should be construed as an excited utterance and, thus, admitted. And it will be admitted over the defense objection.

The trial court did not expressly address Johnson's objection that admission of Rogers' statements on the 911 call violated his rights under the Confrontation Clause.

{¶ 26} Johnson then moved for a judgment of acquittal on both counts, pursuant to Crim.R. 29. The trial court listened to the recording of the 911 call (or at least part of the recording) a second time to determine whether Rogers "explicitly said the child was in her arms at the time the defendant allegedly laid hands on her."

After determining that Rogers "did explicitly state the child was in her arms," the trial court denied the motion. The defense rested without presenting any witnesses.

{¶ 27} Following closing arguments, the trial court found Johnson guilty of both counts as charged. The trial court explained the reasoning behind its verdicts, in relevant part, as follows:

> Defense counsel refers to the defendant's possible consciousness of guilt and perhaps by implication, his clear conscience in calling police to respond to what he thought may have been a threatening situation.
>
> However, it sometimes happens that people do things that are manifestly against their own self interest, either through oversight or failure to clearly think things through, or in heat of the moment or through foolishness.
>
> And the court places no great weight on the fact that the defendant called police in the very jurisdiction in which he was, perhaps unbeknownst to him, a wanted man for an earlier alleged offense.
>
> There is no evidence whatsoever that the victim's throat injuries were self inflicted, and the court is in fact persuaded that they were not.
>
> There are some unanswered questions in this case. Defense counsel is correct. It is not the strongest domestic violence case this court has ever seen either in my capacity as a judge, as a former prosecutor, or as a former legal aid lawyer, often listening to victims of domestic violence.
>
> It isn't uncommon, the court is well aware, that in toxic relationships that domestic violence might be committed, that the complaining witness may, out of fright, out of hope for improvement in the relations, or for other reasons, choose not to actively assist the state in the prosecution of such cases. * * * Having considered the testimony and evidence, having considered the potential prejudice among the witnesses and consistent with the court's earlier ruling as to the admissibility of the 911 audio, the court is in fact persuaded that the state has met its burden of proof as to both counts, and the defendant

is accordingly convicted of domestic violence, a felony of the fourth degree, and endangering children, a misdemeanor of the first degree.[10]

{¶ 28} The trial court referred Johnson for a presentence investigation and report and scheduled a sentencing hearing for the following month. On September 8, 2021, the trial court sentenced Johnson on Count 1 to a suspended 18-month prison sentence and a suspended $5,000 fine and on Count 2 to 5 years of community control sanctions, including six months' confinement at a community-based correction facility, and a $1,000 fine.

{¶ 29} Johnson appealed, raising the following two assignments of error for review:

**Assignment of Error No. 1:**
The trial court erred in denying defendant's motion in limine with regard to the hearsay statements made by Rogers to the Parma police dispatcher during a 911 call.

**Assignment of Error No. 2:**
The guilty verdicts were against the manifest weight of the evidence.

**Law and Analysis**

{¶ 30} In his first assignment of error, Johnson argues that the trial court erred in admitting Rogers' 911 call when Rogers did not testify and was not subject to cross-examination at trial. Johnson contends that Rogers' statements during the 911 call were testimonial, were not part of an ongoing emergency and were made "to

---

[10] The trial court does not identify the "unanswered questions" it found existed in this case. However, the fact that they are significant enough to mention gives us pause as to whether even the trial court truly believed there was sufficient evidence to prove Johnson's guilt beyond a reasonable doubt.

establish or prove past events * * * for the purpose of prosecuting William Johnson." Johnson asserts that these statements "did not fall under any recognized hearsay rule exception" and that, by allowing the state to introduce the 911 call into evidence, the trial court violated his Sixth Amendment right to confront the witnesses against him.

**Confrontation Clause**

{¶ 31} The Sixth Amendment's Confrontation Clause, which is binding on the States through the Fourteenth Amendment, provides: "In all criminal prosecutions, the accused shall enjoy the right * * * to be confronted with the witnesses against him." The "'central concern'" of the Confrontation Clause is "'to ensure the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact.'" *State v. Smith*, 2019-Ohio-3257, 141 N.E.3d 590, ¶ 10 (1st Dist.), quoting *Maryland v. Craig*, 497 U.S. 836, 845, 110 S.Ct. 3157, 111 L.Ed.2d 666 (1990); *see also Michigan v. Bryant*, 562 U.S. 344, 358, 131 S.Ct. 1143, 179 L.Ed.2d 93 (2011) ("Even where * * * an interrogation is conducted with all good faith, introduction of the resulting statements at trial can be unfair to the accused if they are untested by cross-examination. Whether formal or informal, out-of-court statements can evade the basic objective of the Confrontation Clause, which is to prevent the accused from being deprived of the opportunity to cross-examine the declarant about statements taken for use at trial.").

{¶ 32} The admission of a testimonial, out-of-court statement by a declarant who does not testify at trial violates the Confrontation Clause unless the declarant is unavailable and the defendant had a prior opportunity to cross-examine the declarant. *Crawford v. Washington*, 541 U.S. 36, 68, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004); *see also Garfield Hts. v. Winbush,* 187 Ohio App.3d 302, 2010-Ohio-1658, 931 N.E.2d 1148, ¶ 17 (8th Dist.) ("If a statement is testimonial, then the Confrontation Clause requires a showing of both the declarant's unavailability and the defendant's opportunity to have previously cross-examined the declarant. * * * If the statement is nontestimonial, it is merely subject to the regular admissibility requirements of the hearsay rules."), citing *State v. Siler*, 116 Ohio St.3d 39, 2007-Ohio-5637, 876 N.E.2d 534, ¶ 21. We review evidentiary rulings that implicate the Confrontation Clause de novo. *State v. McKelton*, 148 Ohio St.3d 261, 2016-Ohio-5735, 70 N.E.3d 508, ¶ 97.

{¶ 33} Here, there is no indication in the record as to why Rogers did not appear to testify at trial nor is there any indication that a bench warrant was requested for her arrest to secure her appearance; however, there is no dispute that Johnson did not have a prior opportunity to cross-examine Rogers regarding the statements she made in the 911 call. Accordingly, if the statements Rogers made during the 911 call were testimonial, Johnson was denied his right of confrontation.

**"Testimonial" Statements and the Primary Purpose Test**

{¶ 34} In *Crawford*, the Court held that statements made by the defendant's wife during a police interrogation while in police custody were testimonial and could

not be admitted under the Confrontation Clause when the wife did not testify at trial. *Crawford*, 541 U.S. at 38-41, 65-66, 68-69, 124 S.Ct. 1354, 158 L.Ed.2d 177. *Crawford* did not offer an "exhaustive definition" of what constitutes a "testimonial" statement. *Ohio v. Clark*, 576 U.S. 237, 243, 135 S.Ct. 2173, 192 L.Ed.2d 306 (2015); *Crawford* at 68 ("We leave for another day any effort to spell out a comprehensive definition of 'testimonial.'"). However, the Court stated that "[w]hatever else the term covers, it applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations." *Id.* at 68. Following *Crawford*, courts have "labored to flesh out what it means for a statement to be 'testimonial.'" *Clark* at 244.

{¶ 35} The United States Supreme Court announced the "primary purpose test" in *Davis v. Washington*, 547 U.S. 813, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006). Where a statement is made "in the course of police interrogation," including statements made to a "police agent" such as a 911 operator or dispatcher,[11] whether a statement is testimonial depends on the "primary purpose" of the statement. *Davis* at 822; *Bryant* at 370. The Court explained that statements are non-testimonial "when made in the course of police interrogation under circumstances

---

[11] The Court noted that "[i]f 911 operators are not themselves law enforcement officers, they may at least be agents of law enforcement when they conduct interrogations of 911 callers." *Davis*, 547 U.S. at 823, fn. 2, 126 S.Ct. 2266, 165 L.Ed.2d 224. For purposes of *Davis*, the court "consider[ed] their acts to be the acts of police." *Id.* Furthermore, the fact that statements may be "volunteered" during an interaction with police does not preclude them from being testimonial. *Davis* at 822-823, 827, fn. 1 (noting that "volunteered testimony" is still testimony and remains subject to the requirements of the Confrontation Clause).

objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency." *Davis* at 822. Statements are testimonial "when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." *Id.*

{¶ 36} *Davis* identified four characteristics that distinguish non-testimonial statements from testimonial statements: (1) the declarant describes contemporaneous events as they are actually occurring rather than describing past events, (2) an objective ongoing emergency exists, (3) the nature of what is asked and answered, viewed objectively, is necessary to be able to resolve the emergency and (4) the interview is of an informal nature. *Id.* at 826-828; *see also Cleveland v. Johnson*, 8th Dist. Cuyahoga No. 107930, 2019-Ohio-3286, ¶ 18.

{¶ 37} In *Bryant*, the Court clarified "what *Davis* meant" by "an ongoing emergency" and its role in determining the "primary purpose" of an interrogation. *Bryant*, 562 U.S. at 359. In that case, the Court held that statements a mortally wounded shooting victim made to police officers about his assailant (i.e., the identity and description of the shooter and the location of the shooting) in a gas station parking lot (after he had been shot by the assailant outside the assailant's house and had driven himself to the parking lot) were not testimonial because the circumstances objectively indicated that the primary purpose of the conversation was to enable police assistance to address an ongoing emergency, rather than establish evidence for prosecution. The victim was unavailable to testify at trial

because he died shortly after the shooting, so police officers testified at trial about what the victim had told them. *Id.* at 348-350.

{¶ 38} In *Bryant*, the Court indicated that "*Davis* requires a combined inquiry that accounts for both the declarant and the interrogator" and that "[i]n many instances, the primary purpose of the interrogation will be most accurately ascertained by looking to the contents of both the questions and the answers." *Bryant* at 367-368. The Court held that, in applying the primary purpose test, courts must objectively evaluate "all of the relevant circumstances" and determine "the purpose that reasonable participants would have had, as ascertained from the individuals' statements and actions and the circumstances in which the encounter occurred":

> An objective analysis of the circumstances of an encounter and the statements and actions of the parties to it provides the most accurate assessment of the "primary purpose of the interrogation." The circumstances in which an encounter occurs — e.g., at or near the scene of the crime versus at a police station, during an ongoing emergency or afterwards — are clearly matters of objective fact. The statements and actions of the parties must also be objectively evaluated. That is, the relevant inquiry is not the subjective or actual purpose of the individuals involved in a particular encounter, but rather the purpose that reasonable participants would have had, as ascertained from the individuals' statements and actions and the circumstances in which the encounter occurred. * * * When a court must determine whether the Confrontation Clause bars the admission of a statement at trial, it should determine the "primary purpose of the interrogation" by objectively evaluating the statements and actions of the parties to the encounter, in light of the circumstances in which the interrogation occurs.

*Id.* at 359-360, 369, 370-371.

{¶ 39} Addressing the significance of an "ongoing emergency" in determining whether a declarant's statements are testimonial, the Court stated that although "the existence vel non of an ongoing emergency" is not "dispositive of the testimonial inquiry," it is "among the most important circumstances" that "informs the ultimate inquiry regarding the 'primary purpose' of an interrogation." *Bryant*, 562 U.S. at 361, 367, 374, 131 S.Ct. 1143, 179 L.Ed.2d 93.[12]  The Court explained:

> The existence of an ongoing emergency is relevant to determining the primary purpose of the interrogation because an emergency focuses the participants on something other than "prov[ing] past events potentially relevant to later criminal prosecution." *Davis*, 547 U.S. at 822, 126 S.Ct. 2266, 165 L.Ed.2d 224.  Rather, it focuses them on "end[ing] a threatening situation." *Id.* at 832.  Implicit in *Davis* is the idea that because the prospect of fabrication in statements given for the primary purpose of resolving that emergency is presumably significantly diminished, the Confrontation Clause does not require such statements to be subject to the crucible of cross-examination.

*Bryant* at 361.  In other words:

> The existence of an emergency or the parties' perception that an emergency is ongoing is among the most important circumstances that courts must take into account in determining whether an interrogation is testimonial because statements made to assist police in addressing an ongoing emergency presumably lack the testimonial purpose that would subject them to the requirement of confrontation. * * * [T]he existence and duration of an emergency depend on the type and scope of danger posed to the victim, the police, and the public.

---

[12] Although the United States Supreme Court has recognized that "there may be other circumstances, aside from ongoing emergencies, when a statement is not procured with a primary purpose of creating an out-of-court substitute for trial testimony," *see Bryant* at 358; *Clark*, 576 U.S. at 244-245, 135 S.Ct. 2173, 192 L.Ed.2d 306, no one has claimed that any such "other circumstance" existed in this case.  Accordingly, we do not further address that issue here.

*Id.* at 370-371. "[W]hether an emergency exists and is ongoing is a highly context-dependent inquiry." *Id.* at 363.[13]

{¶ 40} Statements a caller makes during a 911 call are often found to be non-testimonial and are admissible if the statements satisfy a hearsay exception. *State v. Jacinto*, 2020-Ohio-3722, 155 N.E.3d 1056, ¶ 61 (8th Dist.). This is because a 911 caller is typically "speaking about events as they [are] actually happening" and "[a]lthough one might call 911 to provide a narrative report of a crime absent any imminent danger," 911 callers are usually facing ongoing emergencies. (Emphasis deleted.) *Davis* at 827 ("A 911 call * * * and at least the initial interrogation conducted in connection with a 911 call, is ordinarily not designed primarily to 'establis[h] or prov[e]' some past fact, but to describe current circumstances requiring police assistance."). Under such circumstances, the 911 caller is not testifying, the 911 caller is not acting as a witness and the statements of the 911 caller are not testimonial in nature. *Id.* at 827-828.

{¶ 41} However, the United States Supreme Court has also expressly recognized that not every 911 call — and not every statement made during a 911 call — is non-testimonial. *See, e.g., id.* at 828-829. "[A] conversation which begins as

---

[13] Factors the Court identified as relevant to determining whether an ongoing emergency exists include: whether physical violence is presently occurring; whether the dispute is a private or public dispute; whether there is an ongoing threat to police or the public; whether the perpetrator's location is known or unknown; whether the perpetrator and victim are separated; the motive(s) of the perpetrator (if known); whether the perpetrator is armed and, if so, the type of weapon(s) the perpetrator has; the victim's medical condition and whether medical assistance is required and whether the scene is secured. *See generally Bryant*.

an interrogation to determine the need for emergency assistance may evolve into testimonial statements once the initial purpose has been achieved." *State v. Cook*, 12th Dist. Warren No. CA2020-08-053, 2021-Ohio-2157, ¶ 30, citing *Davis* at 828. Such an "evolution" may occur if "a declarant provides police with information that makes clear that what appeared to be an emergency is not or is no longer an emergency" or if a perpetrator is disarmed, surrenders, is apprehended or flees "with little prospect of posing a threat to the public." *Bryant*, 562 U.S. at 365-366, 131 S.Ct. 1143, 179 L.Ed.2d 93.

{¶ 42} In *Davis*, the victim did not appear at Davis' trial, and the state introduced a recording of her conversation with the 911 operator. The issue in that case was whether the portion of the victim's 911 call identifying Davis as her assailant was testimonial. *Davis* at 829. At the beginning of the call, the victim told the 911 operator that "[h]e's here jumpin' on me again," that "[h]e's usin' his fists" and that her assailant had not been drinking. The 911 operator then asked the victim the name of her assailant. After she identified her assailant as Davis, the victim told the operator, "He's runnin' now." The victim informed the 911 operator that Davis had "just r[un] out the door" and that he was leaving in a car with someone else. *Id.* at 817-818. The Court held that the portion of the 911 call that included the identification of Davis as the assailant was non-testimonial because (1) the victim was "speaking about events as they were actually happening" rather than describing past events, (2) the victim's call was "plainly a call for help against a bona fide physical threat," (3) the victim's "frantic answers were provided over the phone, in

an environment that was not tranquil, or even * * * safe" and (4) the "nature of what was asked and answered * * * viewed objectively, was such that the elicited statements were necessary to resolve the present emergency" rather than simply learn what had happened in the past. (Emphasis deleted.) *Id.* at 827.

{¶ 43} However, the Court cautioned that other portions of the 911 call — i.e., the victim's statements to the 911 operator after Davis had left the premises — could be testimonial:

> In this case, for example, after the operator gained the information needed to address the exigency of the moment, the emergency appears to have ended (when Davis drove away from the premises). The operator then told [the victim] to be quiet, and proceeded to pose a battery of questions. It could readily be maintained that, from that point on, [the victim's] statements were testimonial, not unlike the "structured police questioning" that occurred in *Crawford*, 541 U.S. at 53, fn. 4, 124 S.Ct. 1354, 158 L.Ed.2d 177.

*Davis* at 828-829.[14] The Court noted that the Washington Supreme Court had concluded that even if later parts of the call were testimonial, their admission was

---

[14] *Hammon*, 547 U.S. 813, 126 S. Ct. 2266, 165 L.Ed.2d 224, also a domestic violence case, was decided with *Davis*. In that case, police questioned a victim of domestic violence on scene after she had been separated from her assailant. A police officer asked her what had happened and, after hearing her account, had her fill out and sign a battery affidavit. *Id.* at 819-820. The victim was subpoenaed but did not appear to testify at trial. The state called the police officer who had questioned the victim to testify regarding what she had told him and to authenticate her affidavit. *Id.* The Court determined that because there was "no emergency in progress" and the victim's statements "were neither a cry for help nor the provision of information enabling officers immediately to end a threatening situation," but rather, were a "deliberate[] recount[ing] * * * how potentially criminal past events began and progressed," "the primary, if indeed not the sole, purpose of the interrogation was to investigate a possible crime" and the fact that the victim's statements were in response to "initial inquires" was "immaterial." *Id.* at 829-832. As such, the victim's statements were testimonial and admission of the police officer's testimony regarding those statements violated the Confrontation Clause. *Id.*

harmless beyond a reasonable doubt. Because Davis did not challenge that holding, the Court simply "assume[d] it to be correct" and did not further address the issue. *Id.* at 829; *see also Bryant* at 363.

{¶ 44} In this case, once Johnson objected to the admissibility of the 911 call, the state, as the proponent of the evidence, bore the burden of establishing the admissibility of Rogers' out-of-court statements. *See, e.g., State v. Hill*, 12th Dist. Butler No. CA80-05-0053, 1981 Ohio App. LEXIS 14266, 4 (Mar. 1, 1981) ("The burden of proving facts which must be established to make evidence admissible is upon the party seeking to introduce the evidence."); *cf. State v. Stover*, 9th Dist. Wayne No. 13CA0035, 2014-Ohio-2572, ¶ 12 (the state, as the party seeking to admit statement under excited-utterance exception to the hearsay rules, had the burden to prove that the statement was made while the declarant was still under the stress of the event); *see also United States v. Duron-Caldera*, 737 F.3d 988, 993 (5th Cir.2013) ("'[T]he government bears the burden of defeating [a] properly raised Confrontation Clause objection by establishing that its evidence is nontestimonial.'"), quoting *United States v. Jackson*, 636 F.3d 687, 695, fn. 4 (5th Cir.2011); *United States v. Arnold*, 486 F.3d 177, 192 (6th Cir.2007) (noting that "the government ha[d] met its burden of proving that [declarant's] statements to the 911 operator and at the scene were nontestimonial").

{¶ 45} Johnson argues that Rogers' statements during the 911 call were testimonial in nature and "were not made as part of an ongoing emergency" because (1) before making the 911 call, Rogers went to her parents' home — "a significant

distance away" from where Johnson allegedly was — and (2) "there was unequivocally no imminent threat to Rogers because she was within the safe confines of her parents' home" at the time of her 911 call.

{¶ 46} In its appellate brief, the state concedes that "[t]his case can be distinguished from *Davis*" because the 911 call "was made approximately 10 minutes after the incident occurred rather than as the events were occurring, which may result in the statements made being considered an account of past events." The state argues that the trial court's ruling should, nevertheless, be upheld because "the trial court in this case admitted the statements made in the 911 call as excited utterances, rather than those made to address an ongoing emergency." (Emphasis deleted.)[15]

{¶ 47} There is, however, no "excited utterance" exception to the Confrontation Clause. Although "in determining whether a statement is testimonial,

---

[15] In support of its contention that the trial court "did not misapply or misinterpret any legal standard when it denied [Johnson's] motion in limine," (emphasis deleted), the state cites *State v. Taylor*, 66 Ohio St.3d 295, 303, 305, 612 N.E.2d 316 (1993), and *State v. Clark*, 2016-Ohio-4561, 67 N.E.3d 182, ¶ 34-35 (8th Dist.). Neither case supports the state's proposition. *Taylor* did not address the Confrontation Clause and held that the trial court had improperly admitted evidence of hearsay statements that did not qualify as excited utterances because the evidence was "insufficient to find" that the declarant was "under the stress of excitement caused by the startling occurrence" at the time he made his statements. *Taylor* at 299-305. In *Clark*, this court held that the trial court did not abuse its discretion in finding that a rape victim's statements to a police officer as soon as he arrived on scene and "within ten minutes of when [a] 911 call came into dispatch," while she was "crying and upset," qualified as excited utterances under Evid.R. 803(2). *Clark* at ¶ 34-35. However, in concluding that the victim's statements were admissible at trial, the court also determined that an emergency "situation" was, at that time, "still very much ongoing" and that the victim's statements to the police officer were non-testimonial where the victim's attackers were unknown to her, at least one of the attackers had a weapon, the attackers were still at large and the victim had not yet been transported to the hospital. The court found that "[u]nder these circumstances, [the victim's] primary purpose in talking to the police officer was to receive assistance from him and the police officer's primary purpose was to assist [the victim]." *Clark* at ¶ 39-41.

'standard rules of hearsay, designed to identify some statements as reliable'" may be "'relevant,'" *Clark*, 576 U.S. at 245, 135 S.Ct. 2173, 192 L.Ed.2d 306, quoting *Bryant*, 562 U.S. at 358-359, 131 S.Ct. 1143, 179 L.Ed.2d 93, whether a statement may fall within a hearsay exception as an excited utterance under the rules of evidence is a separate inquiry from whether admission of that statement violates a defendant's right to confront witnesses under the Confrontation Clause. *See, e.g., State v. Henning*, 9th Dist. Summit No. 29128, 2019-Ohio-2200, ¶ 17, citing *State v. Miller*, 9th Dist. Lorain No. 14CA010556, 2016-Ohio-4993, ¶ 11 ("'Because testimony may be admissible under the Confrontation Clause yet inadmissible under the rules of evidence, and vice versa, the declarant's statements must fall within the constitutional requirements and the rules of evidence to be admissible.'") (Emphasis deleted.), quoting *State v. Nevins*, 171 Ohio App.3d 97, 2007-Ohio-1511, 869 N.E.2d 719, ¶ 36 (2d Dist.).

{¶ 48} "Whenever the state seeks to introduce hearsay into a criminal proceeding, the court must determine not only whether the evidence fits within an exception, but also whether the introduction of such evidence offends an accused's right to confront witnesses against him." *State v. Powell*, 2019-Ohio-4345, 134 N.E.3d 1270, ¶ 38 (8th Dist.), citing *State v. Kilbane*, 8th Dist. Cuyahoga No. 99485, 2014-Ohio-1228, ¶ 29; *see also Smith*, 2019-Ohio-3257, 141 N.E.3d 590, at ¶ 10 ("Although the rule against hearsay and the Confrontation Clause are 'generally designed to protect similar ideals, * * * the Confrontation Clause may bar the admission of evidence that would otherwise be admissible under an exception to the

hearsay rule.'"), quoting *State v. Issa*, 93 Ohio St.3d 49, 60, 752 N.E.2d 904 (2001). Accordingly, whether or not Rogers' statements to the 911 dispatcher were admissible under the rules of evidence as excited utterances does not resolve the issue of whether admission of those statements violates the Confrontation Clause.

{¶ 49} Applying the principles set forth above to the facts of this case, we conclude that there was no ongoing emergency at the time of Rogers' 911 call, that Rogers' statements during the 911 call identifying Johnson as her assailant and reporting what he had done were testimonial[16] and that admission of those statements at trial violated Johnson's constitutional right to confront the witnesses against him.

{¶ 50} According to the Federal Communications Commission, "911 lines are designated for emergency calls, such as reporting a crime in progress, reporting a fire, or requesting an ambulance," *see* https://www.fcc.gov/general/9-1-1-and-e9-1-1-services (accessed Jan. 20, 2023), Walentik testified that, as a 911 dispatcher, she receives calls in "[a]ll kind of circumstances; emergencies, nonemergencies, accidents, crimes in process or crimes after the fact." Accordingly, it cannot be assumed, based solely on the fact that Rogers called 911, that her primary purpose in making the 911 call was to obtain police assistance to resolve an ongoing emergency.

---

[16] To resolve this appeal, we need not decide and, therefore, do not decide, whether every statement Rogers made during the 911 call was testimonial.

{¶ 51} As detailed above, when Walentik asked Rogers, during her initial inquiry, "Where is your emergency?" Rogers responded, "in Parma." Rogers explained that she had "just left" her home in Parma and that she wanted to "report an assault."[17]

{¶ 52} An "emergency" is "an unforeseen combination of circumstances or the resulting state that calls for immediate action," "an urgent need for assistance or relief." *Merriam-Webster's Online Dictionary*, available at https://www.merriam-webster.com/dictionary/emergency (accessed Jan. 20, 2023); *see also Wex*, Cornell Law School Legal Information Institute, available at https://www.law.cornell.edu/wex/emergency (accessed Jan. 20, 2023) (defining "emergency" as "an urgent, sudden, and serious event or an unforeseen change in circumstances that necessitates immediate action to remedy harm or avert imminent danger to life, health, or property; an exigency"). In this case, objectively considering the totality of the circumstances surrounding Rogers' statements to the 911 dispatcher, it is clear that there was no ongoing emergency at the time of Rogers' 911 call.

{¶ 53} At the time Rogers made her 911 call, there was no exigency. There was no urgent need for immediate action and no need for assistance to remedy harm

---

[17] The dissent claims that "[i]t is not clear" what Rogers said during this portion of the 911 call. Dissent at fn. 29. We disagree. However, the dissent's (and trial judge's) claimed inability to hear what Rogers said during portions of the 911 call points out a further problem with using recorded statements to convict a defendant in lieu of live witness testimony. If Rogers had testified live at trial and had not been heard, she could have simply been asked to repeat what she had said.

or to avoid imminent danger to person or property. Walentik learned within the first few seconds of the 911 call that Rogers had left the location where the alleged assault occurred and that Rogers was not facing any immediate harm. After Rogers gave an initial recounting of what had occurred, Walentik confirmed with Rogers that she and her son had left the apartment and were safe with Rogers' parents, many communities away.

{¶ 54} Considering the totality of the circumstances, Rogers' 911 call was made after the alleged assault was over, after Rogers and her son were safe at her parent's house in another city and with no reasonable expectation that Johnson would follow them.[18] Rogers and her son did not need emergency medical services,

---

[18] We recognize that "separation between a victim and the attacker is not dispositive of the ongoing emergency determination" and that "[a]n ongoing emergency can exist after the original threat to the victim has ceased to exist if there is a potential threat to police or the public or the victim is in need of emergency medical services." *Cleveland v. Merritt*, 2016-Ohio-4693, 69 N.E.3d 102, ¶ 10, 19 (8th Dist.). However, as detailed above, this is not such a case. As such, this case is distinguishable from cases like *Merritt* (victim's statements to police officer were not testimonial where victim had been "simply pulled aside" from her attacker, Merritt, "at the then active crime scene," police did not know who Merritt was, how he was involved or whether he had a weapon and victim was "hysterical," upset and crying, with visible injuries the seriousness of which was unknown), *State v. Tomlinson*, 8th Dist. Cuyahoga No. 109614, 2021-Ohio-1301, at ¶ 14, 43 (statements victims of drive-by shooting made to police at the crime scene were non-testimonial where victims had called police "to seek protection and medical treatment," the assailant, armed with a gun, was still at large, location unknown, presenting an immediate continuing threat to the victims, the police and the public and there was no indication that either of the victims had received any medical treatment for their injuries before they spoke with police), *Johnson*, 2019-Ohio-3286, at ¶ 19-20 (although victim was separated from perpetrator, victim's statements to police at park "shortly" after altercation — when victim was concerned perpetrator was "still at her house, 'tearing [it] up,'" and would be at the house when her children came home, posing a physical threat to them — were not testimonial), *Cleveland v. Williams*, 8th Dist. Cuyahoga No. 101588, 2015-Ohio-1739, ¶ 21 (ongoing emergency was still in progress even though the offender had left the scene because the assault occurred "just moments before" the police arrived at the scene, the victim was still at the scene, was injured and crying and her safety had not yet been secured), *State v. Sanchez,* 8th Dist.

the dispute that led to the alleged assault was a private dispute and there is nothing in the record to suggest that Johnson presented any ongoing, immediate physical threat to Rogers, her son, the police, the public or anyone else at the time of the 911 call. The emergency ended when Rogers and her son were safe at her parents' home. Accordingly, there was no "ongoing emergency" at the time of Rogers' 911 call. *See, e.g., State v. Cooper*, 8th Dist. Cuyahoga No. 96635, 2012-Ohio-355, ¶ 6-7 (where witness volunteered information to responding officers before they even exited the cruiser, statement was testimonial because officers' arrival signaled the end of any ongoing emergency and the primary purpose of the statement was for recording past events); *Toledo v. Green*, 2015-Ohio-1864, 33 N.E.3d 581, ¶ 21-25 (6th Dist.) (where victim and alleged perpetrator were in separate rooms, the victim "seemed a little

---

Cuyahoga Nos. 93569 and 93570, 2010-Ohio-6153, ¶ 20 (victim's statements to police at the scene of assault were non-testimonial where although perpetrator had left the scene, "the events * * * occurred just moments before police arrived," the perpetrator had not yet been apprehended and the victim was injured and crying such that "the emergency was still in progress"), *Cleveland v. Colon*, 8th Dist. Cuyahoga No. 87824, 2007-Ohio-269, ¶ 23 (circumstances objectively indicated that the primary purpose of interrogation was to enable police to assist victim in an ongoing emergency where offender had left the scene before the police arrived, the incident had just concluded and the victim was found "hysterical," bleeding, upset and crying with objective signs of abuse when officers first made contact and victim related what had occurred), and *Arnold*, 486 F.3d at 179, 189-190 ("'exigency of the moment'" had not ended and victim's statements to 911 operator were non-testimonial where victim, who had just left her house and was sitting in her car around the corner, told 911 operator that she "need[ed] police" because her mother's boyfriend had pulled a gun on her and was "fixing to shoot" her and victim "had no reason to know whether [he] was following her or not"), quoting *Davis*, 547 U.S. at 828, 126 S.Ct. 2266, 165 L.Ed.2d 224.

At the time of her 911 call, Rogers and her son were not just "separated" from Johnson or removed from the scene, they were in a safe environment and out of danger at Rogers' parents' home in another city. There is nothing in the record to suggest Johnson, at that time, posed a threat to anyone else.

upset" and "was a little bit loud" when police arrived and there was no bona fide physical threat to the victim at the time of her statements to police, no ongoing emergency existed and victim's statements to police were testimonial); *cf. State v. Jones*, 135 Ohio St.3d 10, 2012-Ohio-5677, 984 N.E.2d 948, ¶ 156-159 (witness' statements to police were testimonial where witness called police to report that her husband had confessed to killing a woman, witness was not at an active crime scene, no gun was involved in the murder and although police were still trying to identify and apprehend an at-large perpetrator, police contact with witness was "did not occur in the midst of an ongoing emergency").

{¶ 55} At the outset of the 911 call, Rogers told Walentik that she "wanted to report an assault." Rogers described "what had happened" not "what was happening." Her statements to Walentik are not simply reactive, but demonstrate a level of reflection and, again, were made after a discussion between Rogers and her father. Rogers had ample time to reflect prior to making the 911 call during her drive to her parents' home and after discussing the situation with her father. For example, although there is no indication that Johnson had used, or had access to, a firearm during the alleged assault, Rogers volunteers — even before Walentik asks about weapons — that she had a gun in the apartment, registered in her name, because "I wanted you to know it was there." Upon further inquiry, Rogers indicates that the gun was in the closet of her upstairs bathroom. There is nothing in the record to indicate whether Johnson had knowledge of the existence or location of that gun.

{¶ 56} Although Walentik asked Rogers certain questions related to determining whether she had an immediate need for emergency services — e.g., her location and the location of her son, the location of her assailant, whether her assailant had the means to follow her and whether she needed an ambulance — Walentik's inquiries were not limited to determining the nature and scope of any ongoing emergency to which police or other first responders might need to respond. Walentik testified that once she realized Rogers was not in immediate danger, she transitioned her questioning toward obtaining identifying information about Rogers' assailant and other information police could use to "follow up" on Rogers' report. She also asked Rogers whether she "wanted charges on [Johnson] for doing this." Although Rogers was equivocal about whether she wanted to press charges against Johnson, her response to Walentik reflects that she had contemplated whether to press charges against Johnson (and, in fact, had discussed the issue with her father) prior to making the 911 call, advising Walentik that she did not yet know whether she wanted to press charges against Johnson, but that her father wanted her to do so.[19]

{¶ 57} Viewed objectively, the totality of the circumstances surrounding Rogers' statements to the 911 dispatcher demonstrate that the "primary purpose" of Rogers' statements identifying Johnson as her assailant and detailing what he had done was to provide an account of the assault that had recently occurred — i.e., to

_____

[19] This would also support the position that Rogers' statements were not excited utterances because she had time to reflect and discuss the matter with her father before making the 911 call.

document past events potentially relevant to a later criminal investigation or prosecution — and were, therefore, testimonial. Rogers' statements during the 911 call were simply "'a weaker substitute for live testimony' at trial." *Davis* at 828, quoting *United States v. Inadi*, 475 U.S. 387, 394, 106 S.Ct. 1121, 89 L.Ed.2d 390 (1986).

{¶ 58} Because Rogers' statements identifying Johnson as her assailant and detailing what he had done were testimonial and because Johnson did not have an opportunity to cross-examine Rogers regarding those statements, the trial court's admission of those statements at trial violated the Confrontation Clause.[20]

{¶ 59} Despite the dissent's vehement proclamations to the contrary, we have not, by means of our decision here, "jettisoned a decade of legal authority," "redefin[ed] the bounds of what constitutes an ongoing emergency" or created "conflicts with the law of this district that will prove difficult, if not impossible, for parties to harmonize." Dissent at ¶ 107-108.

{¶ 60} As an examination of the case law (and our analysis) reveals, our decision here does not create any new standards or redefine old ones. This case involves nothing more than the application of established precedent to a unique set of facts — facts that are very different from the facts of *Jacinto*, *Johnson*, *Clark* and the other cases with which the dissent claims a conflict exists.

---

[20] Because we find that Rogers' statements were testimonial and that the trial court's admission of those statements violated Johnson's rights under the Confrontation Clause, we need not address whether the statements were admissible, under the rules of evidence, as excited utterances or under some other hearsay exception.

{¶ 61} In *Jacinto*, 2020-Ohio-3722, this court upheld the admissibility of a 911 call made by an unidentified caller at the scene of a fist fight who was seeking to obtain emergency medical services for the victim. *Id.* at ¶ 17, 23, 71. During the call, the 911 caller describes the victim's current condition, informing the 911 operator that the victim was "knocked out," "barely breathing" and "gasping for air." *Id.* at ¶ 23, 67. Although the caller describes the immediately preceding events that gave rise to the need for emergency medical services, i.e., that the victim had been punched and knocked out and his head had hit the concrete, the court concluded that "it was clear that the primary purpose of the caller's statements was not to establish or prove past events potentially relevant to later criminal prosecution, but rather, to obtain immediate emergency medical assistance for the victim." *Id.* at ¶ 67. Although the 911 caller provided some limited information regarding the perpetrator and "what had happened," i.e., that he was a male and went into the hotel with another male after punching the victim, the focus of the call was not on the perpetrator or the "past events." The caller did not identify the perpetrator or even describe the perpetrator in any detail during the call; he simply indicated that the perpetrator had left the scene and went into the hotel. *Id.* at ¶ 70. Considering the totality of the circumstances, this court held that the out-of-court statements by the 911 caller concerned an ongoing emergency, were not testimonial and that admission of the 911 call did not violate the defendant's rights under the Confrontation Clause. *Id.* at ¶ 71.

{¶ 62} This is not that case. Rogers did not call 911 to obtain immediate medical assistance for herself or anyone else. To the contrary, she told the 911 operator that she did not need any medical services.

{¶ 63} In *Johnson*, 2019-Ohio-3286, this court held that a victim's out-of-court statements to police at a park shortly after an altercation at her home were not testimonial. In that case, the victim was concerned the perpetrator was "still at her house, 'tearing [it] up,'" and would be at the house when her children came home, posing an immediate physical threat to them. *Id.* at ¶ 19-20.

{¶ 64} Once again, this is not that case. In this case, there is no indication that Johnson posed an active, immediate threat to anyone at the time of the 911 call.

{¶ 65} This case is also very different from *Clark*, 576 U.S. 237, 135 S.Ct. 2173, 192 L.E.2d 306. *Clark* involved the admissibility of out-of-court statements a three-year-old had made in response to inquiries by her preschool teachers after teachers discovered red marks on the child. *Id.* at 241. The Court held that the Confrontation Clause did not prohibit prosecutors from introducing the child's statements identifying the defendant as his abuser where the child was not available to be cross-examined because the child's statements to his teachers were not testimonial, i.e., that "[b]ecause neither the child nor his teachers had the primary purpose of assisting in [the defendant's] prosecution, the child's statements [did] not implicate the Confrontation Clause and therefore were admissible at trial." *Id.* at 240, 246. The Court explained:

> L.P.'s [the child's] statements occurred in the context of an ongoing emergency involving suspected child abuse. When L.P.'s teachers noticed his injuries, they rightly became worried that the 3-year-old was the victim of serious violence. Because the teachers needed to know whether it was safe to release L.P. to his guardian at the end of the day, they needed to determine who might be abusing the child. Thus, the immediate concern was to protect a vulnerable child who needed help. * * * L.P.'s teachers were not sure who had abused him or how best to secure his safety. Nor were they sure whether any other children might be at risk. As a result, their questions and L.P.'s answers were primarily aimed at identifying and ending the threat.

*Id.* at 246-247. The Court also noted that given the child's age, it was virtually impossible for the child to have intended that his statements be used to prosecute the defendant and that the context of his statements, i.e., speaking to teachers as opposed to law enforcement, was also a significant factor in determining that his statements were non-testimonial:

> Statements by very young children will rarely, if ever, implicate the Confrontation Clause. Few preschool students understand the details of our criminal justice system. Rather, "[r]esearch on children's understanding of the legal system finds that" young children "have little understanding of prosecution." * * * Thus, it is extremely unlikely that a 3-year-old child in L. P.'s position would intend his statements to be a substitute for trial testimony. On the contrary, a young child in these circumstances would simply want the abuse to end, would want to protect other victims, or would have no discernible purpose at all.
>
> * * *
>
> [A]lthough we decline to adopt a rule that statements to individuals who are not law enforcement officers are categorically outside the Sixth Amendment, the fact that L. P. was speaking to his teachers remains highly relevant. Courts must evaluate challenged statements in context, and part of that context is the questioner's identity. * * * Statements made to someone who is not principally charged with uncovering and prosecuting criminal behavior are significantly less likely to be testimonial than statements given to law enforcement officers. * * * It is common sense that the relationship between a

student and his teacher is very different from that between a citizen and the police. We do not ignore that reality. In light of these circumstances, the Sixth Amendment did not prohibit the State from introducing L. P.'s statements at trial.

*Clark* at 247-249.

{¶ 66} In *Clark*, the statements at issue were those of an abused three-year-old child made when non-law enforcement authorities needed to determine "whether it was safe to release" the child back to his guardian — who may or may not have been the child's abuser. This case, by contrast, involves the admissibility of statements made by an adult who had left the location where the assault occurred, who was in a safe place and who initiated contact with law enforcement to "report an assault." Unlike in *Clark*, there was no active threat of "immediate concern" that needed to be addressed at the time Rogers' statements were made. *Id.* at 247; *see also* fn. 18 above.[21]

_____

[21] The dissent also relies heavily on a sentence extracted from the Ohio Supreme Court's decision in *State v. Beasley*, 153 Ohio St.3d 497, 2018-Ohio-493, 108 N.E.3d 1028, Dissent at ¶ 98-100, 105, to support its position. It is not clear, from the limited analysis in that case, what led the court to conclude that the declarant's statements to a law enforcement officer were non-testimonial. The sum and substance of the court's analysis of that Confrontation Clause issue (set forth after the court concluded the statements at issue were admissible as excited utterances under the rules of evidence) was as follows:

> Davis's statements to Sheriff Hannum are also nontestimonial. Statements to police officers responding to an emergency situation are generally considered nontestimonial precisely because the declarant is usually acting— under great emotional duress—to secure protection or medical care. *See State v. Knecht*, 12th Dist. Warren No. CA2015-04-037, 2015-Ohio-4316, ¶ 24-25 (victim's statement to responding police officers that her husband beat her was nontestimonial); *State v. McKenzie*, 8th Dist. Cuyahoga No. 87610, 2006-Ohio-5725, ¶ 17 (victim's statement was nontestimonial because her primary purpose was to alert police to an ongoing emergency).

*Beasley* at ¶ 183.

{¶ 67} The dissent mischaracterizes our analysis. It is not our view that "there is never an ongoing emergency" whenever a "victim or witness is talking * * * in the past tense." Dissent at ¶ 89. We acknowledge that an ongoing emergency can exist after the original threat to the victim has ceased to exist if there is a continuing threat to police or the public or the victim is in need of emergency medical services (and have cited many cases recognizing this throughout this opinion). However, based on the record before us, this is not that case. A witness' responses to "initial inquiries" by law enforcement officers are not non-testimonial simply because they involve "initial inquiries." *See Davis*, 547 U.S. at 832, 126 S.Ct. 2266, 165 L.Ed.2d 224 (rejecting the "implication that virtually any 'initial inquiries'" by law enforcement officers will be non-testimonial).

{¶ 68} In truth, it is the dissent that seeks to depart from "well-settled law." Dissent at ¶ 105. The dissent seeks to minimize the significance of an "ongoing emergency" — one of the "most important circumstances" that "informs the ultimate inquiry regarding the 'primary purpose' of an interrogation," *Bryant,* 562 U.S. at 366, 370, 131 S.Ct. 1143, 179 L.Ed.2d 93 — when applying the "primary purpose" test. The dissent would have us write "emergency" out of "ongoing emergency" in favor of a rule that a defendant's right of confrontation does not exist unless and until the declarant is objectively "safe from harm," Dissent at ¶ 88,[22] and the

---

[22] The unfortunate truth is that many victims of domestic violence will not be objectively "safe from harm" unless and until they are permanently separated from their assailants. That does not mean that anything an alleged victim of domestic violence states to law enforcement leading up to that point is non-testimonial.

declarant has provided information to responding officers "demonstrating that [the defendant] posed no further threat to anyone." Dissent at ¶ 102. However, that view is not supported by the Sixth Amendment or by *Crawford*, *Davis*, *Bryant* or their progeny. And although the dissent gives "lip service" to the fact that courts must objectively consider all the relevant facts and circumstances when determining the "primary purpose" of an interrogation, *see, e.g., Bryant* at 359-360, 363, 369, its analysis here is inconsistent with that mandate.

{¶ 69} In performing its analysis, the dissent takes certain liberties with the facts. For example, although there is no evidence in the record that Johnson knew Rogers had a firearm in the apartment, knew the location of that firearm (in the closet of an upstairs bathroom) or otherwise had an access to a firearm, the dissent repeatedly asserts, in support of its position, that Johnson "had ready access to a firearm" and "had access to a firearm where he was last seen." Dissent at ¶ 88, 105.

{¶ 70} The dissent also asserts, without explanation, that Rogers' assault was "in part corroborated by investigating officers" and that the 911 dispatcher elicited "details about the assault" from Rogers "that were corroborated by the responding officers." Dissent at ¶ 97, 101. However, the only "detail" potentially related to the alleged assault to which any of the officers testified at trial was the observation of redness on Rogers' neck. And the fact that the 911 dispatcher begins the call by asking Rogers, "Where is your emergency" — before Rogers even speaks and without having any information as to why Rogers is calling — does not establish that "there was still 'very much an emergency'" at the time of Rogers' call." *See* Dissent at ¶ 97.

{¶ 71} The dissent also gives undue primacy to Walentik's purpose in questioning Rogers over Rogers' purpose in communicating with Walentik. However, as *Bryant* instructs, proper assessment of the "primary purpose of the interrogation" "requires a combined inquiry that accounts for both the declarant and the interrogator." *Bryant,* 562 U.S. at 367-368. Although it was Rogers who initiated contact with law enforcement, the dissent largely ignores Rogers' stated purpose in making the 911 call, i.e., to "report an assault," and, instead, asserts (without any support in the record) that we should assume Rogers did not mean what she said. *See* Dissent at ¶ 108 ("in this situation, word choice is not to be taken literally"). The dissent also asks us to assume (again, without pointing to any supporting evidence in the record), that Rogers' primary purpose in calling 911 was "to seek protection from police officers."[23] Dissent at ¶ 100. In addition, the dissent

[23] We are limited to the evidence in the record before us. Based on the limited evidence presented at trial, it is unclear specifically what precipitated Rogers meeting Parma police officers at her apartment following the incident, e.g., whether Rogers requested that police be sent to her apartment to check it out or whether police officers requested that Rogers meet them at her apartment as part of its investigation of the reported assault. During the 911 call, Rogers does not ask Walentik to send police to her apartment. Walentik testified that she could not recall if Rogers received instructions to leave her parents' house and meet police at her apartment. Martin testified only that officers "spoke with [Rogers] over the phone at first" because "she was not on scene when we arrived there." There is no evidence in the record as to how long after the 911 call police (and, later, Rogers) arrived at the apartment following the incident. Even assuming Rogers was motivated to call 911 not only to report her assault but also to obtain police assistance at her apartment, e.g., so she could collect her belongings or ensure that Johnson had left the apartment before she returned, this, in and of itself, would not warrant a finding — given all the other facts and circumstances in this case — that Rogers' statements were non-testimonial. *See Bryant,* 562 U.S. at 368-369, 131 S.Ct. 1143, 179 L.Ed.2d 93 (discussing the potential for victims to have "mixed motives" when making statements to the police).

ignores Walentik's testimony that, once she realized Rogers was not in immediate danger, she transitioned her questioning toward obtaining identifying information about Rogers' assailant and other information police could use to "follow up" on Rogers' report — information that was later used to convict Johnson.

{¶ 72} The law limits the circumstances in which the state may be relieved of its obligation to present sworn testimony that is subject to cross-examination when convicting a defendant — limits that are particularly important where, as here, Rogers' unsworn, untested out-of-court statements constituted the sole evidence supporting Johnson's convictions.

{¶ 73} "Each victim statement * * * must be assessed on its own terms and in its own context to determine on which side of the [testimonial-non-testimonial] line it falls." *Arnold*, 486 F.3d at 189. In this case, based on the evidence before us, objectively considering all the relevant facts and circumstances, we conclude that Rogers' statements to the 911 dispatcher, identifying Johnson as her assailant and reporting what he had done, fall on the testimonial side of that line.

**Harmless-Error Analysis**

{¶ 74} Confrontation Clause claims are subject to a harmless-error analysis. *State v. Beasley*, 153 Ohio St.3d 497, 2018-Ohio-493, 108 N.E.3d 1028, ¶ 178, citing *McKelton*, 148 Ohio St.3d 261, 2016-Ohio-5735, 70 N.E.3d 508, at ¶ 192; *Johnson*, 2019-Ohio-3286, at ¶ 22. Under the harmless-error standard of review, the state bears the burden of demonstrating that the error did not affect the substantial rights of the defendant. *State v. Graham*, 164 Ohio St.3d 187, 2020-Ohio-6700, 172

N.E.3d 841, ¶ 55; *State v. Perry*, 101 Ohio St.3d 118, 2004-Ohio-297, 802 N.E.2d 643, ¶ 15.

{¶ 75} In *State v. Morris*, 141 Ohio St.3d 399, 2014-Ohio-5052, 24 N.E.3d 1153, the Ohio Supreme Court set forth a three-part analysis "to guide appellate courts" in determining whether an error in the admission of evidence has affected the substantial rights of a defendant, thereby requiring a new trial, or whether admission of that evidence was harmless error:[24]

> First, it must be determined whether the defendant was prejudiced by the error, i.e., whether the error had an impact on the verdict. [*Morris*] at ¶ 25, 27. Second, it must be determined whether the error was not harmless beyond a reasonable doubt. *Id.* at ¶ 28. Lastly, once the prejudicial evidence is excised, the remaining evidence is weighed to determine whether it establishes the defendant's guilt beyond a reasonable doubt. *Id.* at ¶ 29, 33.

*State v. Harris*, 142 Ohio St.3d 211, 2015-Ohio-166, 28 N.E.3d 1256, ¶ 37; *see also State v. Boaston*, 160 Ohio St.3d 46, 2020-Ohio-1061, 153 N.E.3d 44, ¶ 63.

{¶ 76} Error in the admission of evidence is harmless beyond a reasonable doubt when "'there is [no] reasonable possibility that the improperly admitted evidence contributed to the conviction.'" *McKelton*, 148 Ohio St.3d 261, 2016-Ohio-5735, 70 N.E.3d 508, at ¶ 192, quoting *Schneble v. Florida*, 405 U.S. 427, 432, 92 S.Ct. 1056, 31 L.Ed.2d 340 (1972). As a general matter, ""the cases where imposition of harmless error is appropriate must involve either overwhelming evidence of guilt or some other indicia that the error did not contribute to the

---

[24] In *Morris*, the Court "dispensed with the distinction between constitutional and nonconstitutional errors under Crim.R. 52(A)." *Harris* at ¶ 37, citing *Morris* at ¶ 22-24.

conviction.'"" *Morris* at ¶ 29, quoting *State v. Rahman*, 23 Ohio St.3d 146, 151, 492 N.E.2d 401 (1986), quoting *State v. Ferguson*, 5 Ohio St.3d 160, 166, 450 N.E.2d 265 (1983), fn. 5.

{¶ 77} As the state concedes, its case against Johnson was "contained entirely within the 911 call." Appellee's Brief at 13; *see also* tr. at 38 (during argument on Johnson's motion in limine, the state asserts that "the 911 call is the state's sole evidence, which you will see at trial").

{¶ 78} The 911 call was the only evidence presented at trial establishing essential elements of the offenses of which Johnson was convicted, i.e., that Johnson "knowingly cause[d] or attempt[ed] to cause physical harm to a family or household member" and that Johnson "create[d] a substantial risk to the health or safety" of R.J. "by violating a duty of care, protection, or support." *See* R.C. 2919.25(A); 2919.25(F)(1)(b); 2919.22(A).

{¶ 79} When police arrived at the scene, no one was in the apartment. Although Rogers lived in an apartment complex, there is nothing in the record to indicate that police spoke with any of her neighbors to see if they had any relevant information regarding the incident. The state presented no testimony from any neighbors or from any other witness that Johnson had been at the apartment at the time of the incident or who may have heard the incident. There is no evidence Rogers sought medical treatment for herself or her son following the incident. No evidence was presented regarding any statements Johnson may have made regarding the incident. As detailed above, Connor testified that Johnson was

arrested at the apartment on August 10, 2020 after Johnson called police and reported that Rogers was threatening him with a knife. Connor stated that Johnson, at that time, declined to give a statement "until counsel was present," but that he never followed up to see if Johnson would be willing to give a statement or be interviewed regarding the March 27, 2020 incident after Johnson obtained counsel.

{¶ 80} Without explanation, Rogers repeatedly failed to appear to testify at trial after being subpoenaed by the state. As such, this case is distinguishable from situations in which a 911 caller is never identified or a 911 caller later dies, becomes incapacitated or is otherwise shown to be unable to testify at trial. When questioned during oral argument in this court about the victim's failure to testify, the assistant prosecuting attorney replied: "There are attempts frequently to do victimless prosecutions * * *[.] There is a thought, at least among some prosecutors, that it favors community and favors victims to be able to put on a case."[25] The absurdity of this statement defies all legal concepts and it is a disturbing trend that we are seeing more often in this court.[26]

---

[25] Pursuant to App.R. 21(J), recordings of these oral arguments are available for review upon request.

[26] Professors Richard Friedman and Bridget McCormack addressed this troubling practice in their law review article, *Dial-In Testimony*, cited by the dissent:

> Sometimes when the reluctant complainant [in a domestic violence case] does testify, she does so inconsistently with the statements she made in her 911 call or to the responding officer. In response, the prosecutor may offer those statements into evidence, asking the fact-finder to credit those statements over the complainant's in court testimony.

{¶ 81} Although it may very well be "easier to go without the victim in these cases," *see* the state's oral argument in *State v. Smith*, 8th Dist. Cuyahoga No. 111274, this practice undermines "the basic objective of the Confrontation Clause," which is "to prevent the accused from being deprived of the opportunity to cross-examine the declarant about statements taken for use at trial." *Bryant*, 562 U.S. at 358, 131 S.Ct. 1143, 179 L.Ed.2d 93. We find this practice to be abhorrent.

---

Often, however, prosecutors do not bother with an unwilling or recanting complainant. Rather, they simply go forward without her, and instead of her live testimony, submit as evidence of the incident the statements carefully taken from her by the 911 operator and the police. In some cases, the prosecutor's decision to pursue a "victimless" prosecution is based on a well-founded belief that the defendant's misconduct has inhibited the complainant from testifying. But often the prosecutor evidently concludes that it is easier to go forward with unsworn, untested statements provided on the 911 tapes than to expose a witness to the risks of testifying at trial.

Richard D. Friedman and Bridget McCormack, *Dial-In Testimony*, 150 U. Pa. L. Rev. 1171, 1189-1190 (2002).

They further noted that in domestic violence cases, "[p]eople know now that if they call 911 and report domestic violence there will probably be an arrest and prosecution" and that "[t]his awareness is reinforced by the fact that many of those who are involved in incidents of domestic violence have been involved before, and even if they have not it is likely that they know someone who has been." *Id.* at 1196. They explained:

[I]ncreased public concern and political attention to the problem, aggressive strategies by police and prosecutors, a receptive attitude by courts, and understanding by participants — means that statements made in calls to 911 or in follow-up interviews with police are likely to result in arrest and prosecution. Additionally, those conversations are likely to be deemed admissible at trial, and many callers are aware of this. So long as courts remain receptive to this evidence, callers effectively will be able to dial in their testimony, without having to appear at trial, take an oath, or subject themselves to cross-examination.

*Id.* at 1200.

{¶ 82} If anything can be said to be "the crucible of advocacy enshrined within [our] judicial system," Dissent at ¶ 93, it is the right of confrontation and cross-examination. Cross-examination is the fundamental means by which parties in our justice system test the evidence in a search for the truth. As such, we must be careful to grant that right the protection it is due.

{¶ 83} "Domestic violence is an intolerable offense that legislatures may choose to combat through many means — from increasing criminal penalties to adding resources for investigation and prosecution to funding awareness and prevention campaigns. But for that serious crime, as for others, abridging the constitutional rights of criminal defendants is not in the [s]tate's arsenal." *Giles v. California*, 554 U.S. 353, 376, 128 S.Ct. 2678, 171 L.Ed.2d 488 (2008); *see also Davis*, 547 U.S. at 832-833, 126 S.Ct. 2266, 165 L.Ed.2d 224 ("We may not * * * vitiate constitutional guarantees" even if "they have the effect of allowing the guilty to go free.").

{¶ 84} We recognize, as the Court recognized in *Davis*, that domestic violence is "notoriously susceptible to intimidation or coercion of the victim to ensure that [he or she] does not testify at trial." *Davis*, 547 U.S. at 832-833, 126 S.Ct. 2266, 165 L.Ed.2d 224. However, remedies exist when a victim is shown to have been intimidated or coerced not to testify. In this case, there was no claim — much less any evidence in the record — that Rogers' failure to appear at trial was due to coercion or intimidation by Johnson or anyone else. It is unknown why Rogers failed to respond to the state's subpoenas and to testify under oath at trial.

Rogers' failure to appear to testify under oath could be an indication her prior statements were untrue.[27]

{¶ 85} Because the 911 call was the only evidence the state presented at trial establishing essential elements of the offenses of which Johnson was convicted, the trial court's error was clearly prejudicial and constitutes reversible error. Johnson's first assignment of error is sustained. Based on our resolution of Johnson's first assignment of error, Johnson's second assignment of error is moot.

{¶ 86} In closing, we feel compelled to address the dissent's accusation that we have gone rogue and decided this case based on "a new, unbriefed issue" and arguments that "the state has never been presented the opportunity to address." Dissent at ¶ 95. The dissent does not specify the particular argument(s) or issue(s) addressed in this opinion that it contends are outside the scope of our review. However, as detailed above, the only issues we have decided here is whether the trial court's admissions of Rogers' statements during the 911 call identifying Johnson as her assailant and reporting what he had done violated Johnson's rights under the Confrontation Clause and constituted reversible error. The record is clear that the state had ample opportunity to address those issues (1) when arguing against Johnson's motion in limine before the trial court, (2) when responding to Johnson's

---

[27] We are mindful that there are a myriad of reasons why a victim of domestic violence may be disinclined to appear in court and testify against his or her assailant. In an attempt to address some of these issues, Cuyahoga County offers various resources and services to assist victims of domestic violence (as well as victims of other crimes) as they attempt to navigate the criminal justice system. Such resources include victim witness advocates, who can help victims understand their rights, access available services and support victims when they testify in court (and throughout the criminal justice process).

first assignment of error in its appellate brief and (3) during oral argument before this court.[28]

{¶ 87} Judgment reversed, convictions vacated, and case remanded.

It is ordered that appellant recover from appellee the costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the Cuyahoga County Court of Common Pleas to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
EILEEN A. GALLAGHER, JUDGE

EMANUELLA D. GROVES, J., CONCURS;
SEAN C. GALLAGHER, P.J., DISSENTS (WITH SEPARATE OPINION)

---

[28] The dissent maintains that because Johnson's argument in his appellate brief focused on *Davis*, the "seminal case" in this area, and Johnson did not cite to other "interpretative cases" that "would better inform the appellate analysis," this "doomed" his appeal, and we should affirm the trial court without considering the merit of his assignment of error. Dissent at ¶ 91-92. We agree that both parties could have done a better job briefing the issues before us. However, we do not believe the deficiencies the dissent claims exist in Johnson's appellate brief warrants such a result, particularly given that (1) the Confrontation Clause issue was raised, and argued at length, below, (2) evidentiary rulings that implicate the Confrontation Clause are subject to de novo review, (3) it was the state's burden to establish the admissibility of this evidence below — a fact the dissent does not dispute but ignores — and (4) the state did not even address the primary purpose test in its appellate brief and, instead, argued that the trial court's admission of Rogers' statements should be upheld because "the trial court * * * admitted the statements made in the 911 call as excited utterances, rather than those made to address an ongoing emergency." Indeed, even where a party fails to cite any supporting legal authority or fails to argue an assignment of error separately in its brief — which is not the situation here — our rules provide that the court "may disregard" an assignment of error presented for review. App.R. 12(A)(2); App.R. 16(A)(7). Our rules do not require us to ignore an otherwise valid assignment of error simply because it could have been argued "better" in an appellant's brief.

SEAN C. GALLAGHER, P.J., DISSENTING:

{¶ 88} We do not live in the compartmentalized world depicted by the majority. Domestic abuse victims fleeing their supposed loved ones, especially those like Johnson who had access to a firearm where he was last seen, do not have the luxury of being safe just because there is a temporary lull in the aggression or a brief distance from the belligerent. At the time the victim called 911 for police protection, it cannot be said that the domestic abuse victim was safe from harm without discarding an objective review of the facts and circumstances as they unfolded. I respectfully dissent.

{¶ 89} If the majority's analysis became law, there will never be an identification of a defendant or the crime where the state is not required to present a live witness. An agent of law enforcement, once called or dispatched, is *always* present when the victim or witness is talking, and that is always in the past tense since few victims or witnesses are able to call for emergency assistance as, in this case, they are being beaten by the offender. Thus, in the majority's view, there is never an ongoing emergency and any such statement would always be testimonial since the statements arise after the fact. *See, e.g., State v. Jones*, 8th Dist. Cuyahoga No. 110742, 2022-Ohio-1936 (despite calling for emergency medical assistance to treat third-degree burns to over 10 percent of the victim's body, the 911-call contents were testimonial in nature). The United States Supreme Court begs to differ. *See generally Davis v. Washington*, 547 U.S. 813, 832, 126 S.Ct. 2266, 165 L.Ed.2d 224

(2006) (state may prosecute an offender when the only evidence substantiating all elements of the crime is hearsay presented through extrinsic evidence).

{¶ 90} As with all cases, the analysis should begin with the briefs provided for our review. But that is the problem for the majority's analysis and conclusion; Johnson has not presented any analysis or discussion justifying the lengths the majority takes to reach the outcome.

{¶ 91} The appellant's brief contains close to three pages of legal analysis and discussion with respect to the Confrontation Clause issue, six pages in total if the facts and procedural history are included. The sole connection between the majority's lengthy analysis and Johnson's cursory briefing is his citation to the seminal case, *Davis*, which was unaccompanied with analysis or discussion of the legal principles at play or any reference to the vast body of case law developed in *Davis's* wake. *Davis* has been cited over 5,700 times in the last decade and a half, and one would think that a discussion of at least one of those interpretative cases would better inform the appellate analysis. Instead, Johnson was silent as to the vast multitude of cases applying *Davis,* a tacit indication that of the over 5,700 case citations, few support his position.

{¶ 92} Further, and most important given the majority's conclusion, Johnson failed to demonstrate the existence of error in order to shift the burden to address the second part of the constitutional analysis, the harmless-error part of the analysis that is required to demonstrate reversible error. *See* Maj. Op. at ¶ 72. This alone should have doomed his argument.

{¶ 93} This by no means is meant to criticize the briefing in this matter. In fact, not much criticism can be laid upon Johnson. His approach apparently bears fruit. The majority's opinion only reinforces the tactic of litigants advancing a general policy argument based on a solitary citation in the hopes of finding an issue that potentially gains traction through the appellate court's own analysis and discussion, which is hardly a substitute for the crucible of advocacy enshrined within the judicial system. If we continue to condone this style of advocacy, we might as well shed the obligation to provide analysis and discussions under App.R. 16 altogether and just have the parties provide a list of cases they believe applicable to the cause.

{¶ 94} This shift away from relying on the arguments as presented represents a broader trend in which courts of review no longer bind themselves to the arguments presented by the parties, but instead substitute their judgment for that of lower court on certain matters, even those not preserved for review. *See, e.g., State v. Gwynne*, Slip Opinion No. 2022-Ohio-4607, ¶ 74 ("*Gwynne II*") (Kennedy, J., dissenting) ("An appellate court relies on the parties in a case to determine the issues and to argue the applicable law."). It is not the appellate court's responsibility to provide analysis and a complete discussion of all relevant issues when the appellant fails to substantiate his assignment of error, even under a de novo standard of review. *State v. Quarterman*, 140 Ohio St.3d 464, 2014-Ohio-4034, 19 N.E.3d 900, ¶ 19, quoting *State v. Bodyke*, 126 Ohio St.3d 266, 2010-Ohio-2424, 933 N.E.2d 753, ¶ 78 (O'Donnell, J., concurring in part and dissenting in part), and

*Carducci v. Regan*, 714 F.2d 171, 177, 230 U.S. App. D.C. 80 (D.C.Cir.1983) ("[A]ppellate courts do not sit as self-directed boards of legal inquiry and research, but [preside] essentially as arbiters of legal questions presented and argued by the parties before them.").

{¶ 95} More important, the state has never been presented the opportunity to address the majority's analysis or discussion, which far exceeds the limited arguments Johnson presented. *State v. Tate*, 140 Ohio St.3d 442, 2014-Ohio-3667, 19 N.E.3d 888, ¶ 21, quoting *State v. 1981 Dodge Ram Van*, 36 Ohio St.3d 168, 170, 522 N.E.2d 524 (1988) ("[A]ppellate courts should not decide cases on the basis of a new, unbriefed issue without 'giv[ing] the parties notice of its intention and an opportunity to brief the issue.'"). If the majority is questioning which of its arguments the state was deprived of the opportunity to respond, Maj. Op. at ¶ 84, one need look no further than Johnson's failure to provide a foundation for the harmless-error analysis, although the fact that Johnson's argument is limited to a single case citation reciting the black-letter law should be enough in and of itself.

{¶ 96} Essentially, the majority is concluding that its newly crafted argument in support of reversing the trial court is correct; but in doing so, the majority completely removes the shackles of advocacy that once bound appellate courts. *Sizemore v. Smith*, 6 Ohio St.3d 330, 333, 453 N.E.2d 632 (1983), fn. 2. This sets this district down a dangerous path of creating self-directed boards of judicial review; the briefing would be irrelevant at that point.

{¶ 97} Nevertheless, the majority's decision to exclude contents of a 911-call recording, even if Johnson had presented the majority's argument, may prove to be the bridge too far. This case involves domestic abuse and originates from a 911 call seeking emergency assistance because the victim had been forced to evacuate her home with her baby after being assaulted by Johnson in the middle of the night — an assault in part corroborated by investigating officers. As the 911 operator testified, she believed the victim's call presented an emergency because the victim was assaulted, "immediately called," and although there was no immediate danger because Johnson was unable to follow the victim, there was still "very much an emergency." Tr. 58:12-18; 61:3-6. In fact, the first question asked by the 911 operator was seeking information about the "emergency." The victim provided that information.[29]

{¶ 98} During the first two minutes of the approximately five-minute call, the portion of which Johnson does not even challenge as being inadmissible,[30] the

---

[29] The 911 recording was not officially transcribed by the court reporter at trial. The quoted material from the 911 recording contained in the majority decision is its own transcription of the audio version introduced at trial. It is not clear whether the victim said her call was intended to "report" an assault in the opening ten seconds of the call because that sentence was jumbled through the victim's audibly, and understandably, distraught state. Although the victim started to say a word beginning with an "r," the entire word is not intelligible because it was covered by gasping or sobbing. Notwithstanding, "reporting" a crime does not in and of itself confirm that the statements made in response to preliminary questions from emergency services operators automatically shifts the statements into the testimonial category. The factual scenario playing out determines how the statement will be characterized, not the word choice used by a frantic victim.

[30] According to Johnson, the only offending information was the identification approximately two minutes into the recording: "During the 911 recording, the radio

victim was audibly upset and unable to fully articulate the nature of the call or the scope of necessary assistance. The victim was still acting under the emotional duress of the then currently evolving situation. This demonstrates that the victim was not in a state of mind to believe she was providing formal testimony for trial and she was, without doubt, answering questions in an informal and unstable setting. *State v. Beasley*, 153 Ohio St.3d 497, 2018-Ohio-493,108 N.E.3d 1028, ¶ 183 (statements to initial responding officers, much like statements to 911 operators, are generally non-testimonial because the declarant is generally acting—under great emotional duress—to secure protection); s*ee also Willingham v. Bauman*, 6th Cir. No. 20-1017, 2020 U.S. App. LEXIS 12989, 10 (Apr. 22, 2020) (the call "'was clearly made with the primary purpose of assisting in an ongoing emergency,' noting that '[the caller] was so agitated by the events that the trial court, in listening to the 911 recording, had difficulty understanding her at times, tending to show that the statements were made 'in an environment that was not tranquil, or even . . . safe'"), quoting *People v. Willingham*, App. No. 331267, 2017 Mich. App. LEXIS 1331, 18 (Aug. 15, 2017).

{¶ 99} At no point did the victim, even *from her perspective*, dispel the notion that she was "reporting" what she believed to be an ongoing emergency. In the first two minutes of the call, there were only a few questions asked in an effort to determine the level of emergency response needed (about locations, whether there

---

dispatcher requested personal identifying information of the Appellant William Johnson at approximately 1:45-2:00 minutes into the recording. This information was taken for investigative purposes in order to pursue prosecution * * *."

were children still at the apartment, and whether Johnson had access to a firearm or was still present), with the victim at first offering a frantic narrative instead of offering contemplated responses to formal questioning. *Beasley* at ¶ 183. This is not, if objectively viewed, a victim calling to preserve testimony for prosecution. According to black-letter law, "[s]tatements to police officers responding to an emergency situation are generally considered nontestimonial precisely because the declarant is usually acting—under great emotional duress—*to secure protection* or medical care." (Emphasis added.) *Id.*, citing *State v. Knecht*, 12th Dist. Warren No. CA2015-04-037, 2015-Ohio-4316, ¶ 24, and *State v. McKenzie*, 8th Dist. Cuyahoga No. 87610, 2006-Ohio-5725, ¶ 17. An initial call to emergency responders is no different.

{¶ 100} The victim in this case called for emergency assistance in order to seek protection from police officers to enable the victim and her baby to return to their home because the whereabouts of Johnson were unknown and he potentially had access to a firearm. The majority does not acknowledge the Ohio Supreme Court's conclusion in *Beasley* that seeking protection is part of the inquiry. Instead the majority solely focuses on the victim's lack of need for medical attention because in this particular case, the victim was not seeking medical assistance. Maj. Op. at ¶ 62. It is (well, now was) settled law that a statement to emergency responders in which police protection is sought satisfies the constitutional standard the same as a call for medical assistance would. *Beasley* at ¶ 183. The majority's extremely narrow focus contradicts binding authority and does not consider the call for protection

aspect of this constitutional inquiry. *See, e.g., Cleveland v. Johnson*, 8th Dist. Cuyahoga No. 107930, 2019-Ohio-3286.

{¶ 101} In the last three minutes of the call, the only portion actually being challenged as inadmissible by Johnson, the 911 call operator was able to calm the victim enough to get a better picture of the necessary emergency response by asking basic questions, including details about the assault that were corroborated by the responding officers, the identity of all parties involved, and the offender's access to weapons in the apartment to which officers were responding — "the exact type of questions necessary to allow the police to 'assess the situation, the threat to their own safety, and possible danger to the potential victim.'" *Michigan v. Bryant*, 562 U.S. 344, 376, 131 S.Ct. 1143, 179 L.Ed.2d 93 (2011), quoting *Davis*, 547 U.S. 813, 832, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006); *United States v. Arnold*, 486 F.3d 177, 190 (6th Cir.2007) (affirming the admission of the 911 call in an assault case, in which the out-of-court statements were the primary evidence of guilt, because "[a]t the time [the victim] made the call, she had no reason to know whether [defendant] had stayed in the residence or was following her."). The victim also indicated that she was not sure if she was willing to press charges for the assault, an objective indication that between both parties to the conversation, neither had an intent to use the statements as substitutes for trial testimony.

{¶ 102} At no point in time was the victim able to provide information to the officers demonstrating that Johnson posed no further threat to anyone, much less the victim. A police response was required to verify that fact.

**{¶ 103}** The primary purpose of the victim's statements was intended to seek police protection from Johnson, who had just assaulted and driven the victim and her baby from their home. That was not a formal inquisition meant to memorialize trial testimony to convict Johnson. *See, e.g., Hammon v. Indiana,* consolidated with *Davis* (officers inquisition in the more formal setting of a room in which the victim was isolated from the alleged attacker and through which the officers procured a formal statement from the victim was testimonial).

**{¶ 104}** Tellingly, the majority justifies its decision to reverse the conviction with four conclusions, none of which demonstrates the existence of error, but all of which solely focus on the nature of the ongoing emergency (to the exclusion of the totality of the above analysis). According to the majority, the primary purpose of the victim's call to the 911 operator was testimonial because (1) it cannot be presumed that the primary purpose of the 911 call was to resolve an ongoing emergency, Maj. Op. at ¶ 49-51; (2) "emergency" as defined in the dictionary means "an urgent need for assistance or relief," and there was no urgent need for assistance in this case at the time the victim frantically called for police assistance after having been assaulted and forced to flee her home by Johnson's belligerence, Maj. Op. at ¶ 52-54; (3) any emergency somehow ceased to exist because of the newly adopted definition of "emergency," and it turned out that neither the victim nor her baby was injured, Maj. Op. at ¶ 54-55 (although how the operator was supposed to know that when first asking the question is a question the majority leaves unanswered); and (4) the victim inaudibly told the 911 operator that she wanted to "report an assault" in the first ten

seconds of the 911 call, and therefore, the victim was formally memorializing testimony for later use at trial, Maj. Op. at ¶ 56, despite her demonstrable agitated and distraught state at the time of the call.

{¶ 105} If the state had been given the opportunity to address the majority's newly formed arguments, it would likely be along the lines that (1) no one is claiming that there is a presumption of admissibility of 911-call recordings because there is no such presumption; (2) that a rigid, dictionary definition of "ongoing emergency" is contrary to Supreme Court holding in *Bryant* that the outer bounds of what constitutes an ongoing emergency cannot be defined, much less by simply defining the word "emergency" (more on this later); (3) that contrary to well-settled law, including *Cleveland v. Merritt*, 2016-Ohio-4693, 69 N.E.3d 102, ¶ 19 (8th Dist.), *Johnson*, 8th Dist. Cuyahoga No. 107930, 2019-Ohio-3286, and *Beasley*, 153 Ohio St.3d 497, 2018-Ohio-493, 108 N.E.3d 1028, at ¶ 183, the ongoing emergency had not ended because the offender's whereabouts were unknown, he had ready access to a firearm, and the victim required police protection to return to her home with her baby; and finally (4) that using the phrase "reporting an assault" did not mean the victim intended to use the statements for trial because, in considering the victim's frantic and distraught state, the 911 operator expressly testified (in cross-examination) that she believed the victim was facing an ongoing emergency and was not merely "reporting" an earlier assault.  Further on this last point, according to *State v. Jacinto*, 2020-Ohio-3722, 155 N.E.3d 1056, ¶ 67 (8th Dist.), simply because the caller spoke in the past tense or used a particular word choice to describe the

events does not mean the ongoing emergency has ended. Apparently, however, a victim speaking in the past tense now matters for the purposes of the constitutional analysis. Maj. Op. at ¶ 55. How quickly the winds have shifted.

{¶ 106} One cannot listen to the 911 recording without appreciating the impact Johnson's assault had on the victim even ten minutes removed. This is why Confrontation Clause "evaluations take into objective account the circumstances ([whether the questioning is in a] formal or informal [setting]); the medical condition of the victim (nature of the harm, degree of debilitation); the information known at the time of the questions; and the nature of the questions and responses; among other elements that comprise the full context of the challenged statement." *Diggle v. Sheldon*, N.D.Ohio No. 3:13 CV 442, 2016 U.S. Dist. LEXIS 41297, 5 (Mar. 29, 2016), citing *Bryant* at 356-369. It is not as simple as concluding that the victim lacked the need of medical assistance and had a distance between herself and the attacker. One would think that *Davis* and its progeny would be largely unnecessary if that were the case.

{¶ 107} Of particular concern as to the constitutional analysis, by redefining the bounds of what constitutes an ongoing emergency through a common dictionary definition, the majority has jettisoned a decade of legal authority. The outer bounds of what is considered an "ongoing emergency" *is purposely not defined* and is instead based on a "highly context-dependent inquiry." *Bryant*, 562 U.S. at 363, 131 S.Ct. 1143, 179 L.Ed.2d 93. "[T]he Supreme Court has never defined the scope or weight of the 'ongoing emergency.'" *Woods v. Smith*, 660 Fed.Appx. 414, 428 (6th

Cir.2016). Courts should not take the Supreme Court's reluctance to provide an exhaustive definition of the term lightly, nor should an intermediate state court necessarily be redefining the scope of federal rights.

{¶ 108} Above all other issues with the sua sponte analysis, the majority's decision appears to present the following conflicts with the law of this district that will prove difficult, if not impossible, for parties to harmonize. First, the majority's reliance on the dictionary definition in an attempt to define the outer bounds of what constitutes an ongoing emergency is contrary to binding precedent that has been continually applied in Ohio, if not this district. *Bryant*, 562 U.S. at 363. If the majority's position stands, this district likely is one of the only in the country to actually define the outer bounds of what constitutes an emergency. *But see Ohio v. Clark*, 576 U.S. 237, 245, 135 S.Ct. 2173, 192 L.Ed.2d 306 (2015) (ongoing emergency exists when the circumstances of potential abuse are not clear at the time of the questioning). Second, the majority's conclusion that fleeing her home and the attacker ended the emergency contradicts the settled proposition that mere separation from the attacker does not "end the emergency." *Merritt*, 2016-Ohio-4693, at ¶ 19 (collecting cases); *Johnson*, 8th Dist. Cuyahoga No. 107930, 2019-Ohio-3286, at ¶ 19-20 (although the victim was separated from the perpetrator, the victim's statements to police at the park "shortly" after the altercation — when the victim was concerned the perpetrator was "still at her house, 'tearing [it] up,'" and would be at the house when her children came home, posing a physical threat to them — were not testimonial). And third, the majority's overreliance on the victim's

supposed statement that she was "reporting an assault" contradicts the holding that in this situation, word choice is not to be taken literally; courts must review the entire context in which the statements are made. *Jacinto*, 2020-Ohio-3722, 155 N.E.3d 1056 (8th Dist.) ("simply" because the caller spoke in the past tense to describe the events does not mean the ongoing emergency has ended).

{¶ 109} I respectfully dissent and would affirm solely based on the limitations of Johnson's arguments.